ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
KATHARINE SCHONBACHLER
Assistant United States Attorney
Asset Forfeiture Section
California Bar No. 222875
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-3172
    Facsimile:  (213) 894-7177
    E-mail: Katie.Schonbachler@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

            Plaintiff,

                v.

$5,437,986.06 AND $32,886.36 IN
BANK FUNDS,

            Defendants.

No. CV13-8685DDP (JENx)

VERIFIED COMPLAINT FOR FORFEITURE

[18 U.S.C. §§ 981(a)(1)(A) and (C)]

[F.B.I.]

     The United States of America brings this claim against the defendants $5,437,986.06 and $32,886.36 in Bank Funds and alleges as follows:

### JURISDICTION AND VENUE

     1.   This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

     2.   This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

1    3.    Venue lies in this district pursuant to 28 U.S.C. §

2  1395(b).

3                    PERSONS AND ENTITIES

4    4.    The plaintiff is the United States of America.

5    5.    The defendants $5,437,986.06 and $32,886.36 in Bank Funds

6  are more specifically (1) $5,437,986.06 in bank funds from Australia

7  and New Zealand Banking Group, Ltd. ("ANZ") account ending in 368[1]

8  held in the name of Morgan Pacific Inter Vivos Settlement Trust ("ANZ

9  368"); and (2) $32,886.36 in bank funds from ANZ account ending in

10  662 held in the name of Morgan Pacific Inter Vivos Settlement Trust

11  ("ANZ 662") (collectively referred to as the "bank funds").  The

12  defendant bank funds were seized on May 26, 2013 pursuant to an

13  agreement that was signed by Todd Ficeto and his counsel on April 26,

14  2013, and deposited into an account maintained by the United States

15  Marshals Service ("USMS").

16    6.    The interests of Todd M. Ficeto ("Ficeto"), Charles Ficeto,

17  Morgan Pacific Inter Vivos Settlement Trust, Pacific Blue Consulting,

18  Ltd., and Southpac Trust International, Inc. may be adversely

19  affected by these proceedings.

20    7.    The defendant bank funds are in the custody of the United

21  States Marshals Service, where they shall remain subject to this

22  court's jurisdiction during the pendency of this action.

23  ///

24  ///

25

26    [1] Pursuant to Local Rule 5.2-1, full account numbers have been
    redacted from this Complaint.

27

28

1

## EVIDENCE SUPPORTING FORFEITURE

2      8.   The defendant bank funds are proceeds from an international

3   securities fraud scheme that involved the manipulation of billions of

4   shares in United States "penny stock"[2] companies through a Beverly

5   Hills-based broker-dealer, Hunter World Markets, Inc. ("Hunter

6   World"), which was co-owned by Ficeto and Florian Homm ("Homm").

7   Homm, Ficeto, and other co-conspirators caused certain hedge funds

8   managed by Homm (the "Absolute Funds") to invest in the penny stocks,

9   and then, by trading the stocks among the Absolute Funds,

10  fraudulently inflated and/or propped up the stock prices to

11  exaggerate the purported profitability of the funds.  This enabled

12  the conspirators, including Ficeto, Homm, and their entity, Hunter

13  World, to sell their own shares of the penny stocks to the Absolute

14  Funds at the inflated prices.  The stock price inflation also served

15  to fraudulently overstate the performance of the Absolute Funds

16  which, in turn, generated substantial performance fees and other

17  compensation for Homm.  As a result of the fraud, the Absolute Funds

18  lost at least $200 million.

19  ///

20  ///

21  ///

22  ///

23

24

25

26      [2] The term "penny stock" generally refers to low-priced (below $5 and often below $1) securities of very small companies that
27  typically trade on an over-the-counter quotation service (rather than a national stock exchange), but could also trade on foreign
    securities exchanges.

28

9.   As described in detail below, Ficeto and Hunter World received millions of dollars in profits from fraudulent transactions related to the penny stock companies.  Profits from self-dealing transactions in shares of the penny stocks were primarily cleared through accounts that Ficeto controlled at RBC Dain Rauscher ("RBC"), a Minneapolis, Minnesota-based company that specialized in clearing, custody and execution services.  Ficeto controlled several accounts at RBC including, but not limited to accounts held in his name, Hunter World, as well as two accounts held in the names of his minor children, for which he was custodian.  Ficeto and Hunter World also received fraud proceeds from accounts managed by Wells Fargo Corporate Trust ("WF Trust") and Troy Gould.  The payments from WF Trust and Troy Gould, a law firm that acted as transactional counsel for the various private placements, represented fees for Hunter World's role as placement agent for the penny stock companies.

10.   Ficeto would then cause the fraud proceeds that he received to be transferred to other accounts under his control at financial institutions in the United States.  As reflected in Exhibit B, after he transferred the proceeds to various accounts, he eventually transferred approximately $10 million of the proceeds to ANZ 662 accounts in the Cook Islands.  The tracing of the proceeds (defendant bank funds) transferred into the subject ANZ accounts is outlined in Exhibits A and B and in paragraphs 42-53 below.

11.   At all times relevant to this Complaint, the individuals and entities involved in the fraud scheme included:

a.   <u>Todd M. Ficeto</u>:  Ficeto, a United States citizen and resident of Malibu, California and Columbus, Ohio, was a registered

4

securities representative and President and Director of Hunter World, in which he held a 50 percent interest.  Ficeto founded Hunter World in or about March 2004.  Homm and Ficeto each held a 50 percent co-ownership interest in Hunter World, but Ficeto managed all of Hunter World's business.  According to filings of the Securities & Exchange Commission ("SEC"), Ficeto was under heightened regulatory supervision from November 2004 until June 2006.  He has a history of regulatory discipline, and was censured and fined by the National Association of Securities Dealers ("NASD") in 1996, 2002, and 2004. Ficeto made approximately $27.3 million as a result of the fraudulent scheme, including stock sales, sales credits, commissions and other fees.

   b. <u>Florian Jürgen Homm</u>:  Homm, a German national and resident of Palma de Mallorca, Spain, was a co-founder, Director, and Chief Investment Officer ("CIO") of Absolute Capital Management Holdings Limited ("ACMH"), a hedge fund management company, and a 50 percent owner of Hunter World.  As CIO of ACMH, Homm held powers of attorney that enabled him to invest on behalf of the Absolute Funds. In this position, Homm had primary control over the investment decisions of the Absolute Funds.  Through CSI Asset Management Establishment ("CSI"), a Liechtenstein investment vehicle that Homm controlled, Homm also held more than 50 percent of the outstanding shares of the management company ACMH.  Homm summarily resigned from ACMH and fled Palma de Mallorca on September 18, 2007. On or about March 19, 2013, Homm was indicted in the Central District of California (<u>United States v. Homm</u>, CR Misc. No. 13-0183) for violations of 18 U.S.C. § 1349 (conspiracy to commit securities

1   fraud); 18 U.S.C. § 1348 (securities fraud); 18 U.S.C. § 1343 (wire

2   fraud); and 18 U.S.C. § 2 (aiding and abetting and causing an act to

3   be done).  Homm was arrested in Italy in March 2013, and the United

4   States is currently seeking his extradition.

5         c.   Colin Heatherington ("Heatherington"):  Heatherington,

6   a Canadian national, was the head trader at ACMH in Palma de

7   Mallorca, Spain, and worked closely with Homm.  Heatherington was

8   involved on a daily basis in trading for the Absolute Funds, and was

9   in regular contact with Hunter World and Ficeto.  Heatherington also

10  co-owned and controlled CIC Global Capital Limited ("CIC Global"), a

11  British Virgin Islands entity, along with his brother Craig

12  Heatherington, who also was an ACMH employee.  As described below,

13  Heatherington and his brother used CIC Global as a means to steal

14  money from the Absolute Funds and to launder proceeds of the

15  fraudulent scheme.  On or about October 8, 2013, a criminal complaint

16  was issued against Heatherington in the Central District of

17  California (United States v. Heatherington, CR Misc. No. 13-2726) for

18  violations of 18 U.S.C. § 1349 (conspiracy to commit securities

19  fraud); 18 U.S.C. § 1348 (securities fraud); and 18 U.S.C. § 1343

20  (wire fraud).

21        d.   Absolute Capital Management Holdings Limited:  ACMH

22  was a Cayman-Islands incorporated entity with offices in London,

23  United Kingdom; Zug, Switzerland; Palma de Mallorca, Spain; and Grand

24  Cayman, Cayman Islands.  ACMH was the investment manager for the

25  eight Cayman Islands-based Absolute Funds:  Absolute East West Master

26  Fund Limited ("East West Fund"); Absolute Activist Value Master Fund

27  Limited ("Activist Value Fund"); Absolute Large Cap Master Fund

28

Limited ("Large Cap Fund"); Absolute European Catalyst Fund Limited ("European Catalyst Fund"); Absolute Germany Fund Limited ("Germany Fund"); Absolute India Fund Limited ("India Fund") ; Absolute Octane Master Fund Limited ("Octane Fund"); and Absolute Return Europe Fund Limited ("Return Europe Fund").   The Absolute Funds purportedly had $2.1 billion in assets under management as of August 31, 2007.   ACMH was paid management and performance fees based on the performance of each Absolute Fund, calculated as a percentage of each respective Fund's Net Asset Value ("NAV").

        e.   <u>Hunter World Markets, Inc.</u>:   Hunter World was a California corporation based in Beverly Hills, California.   Hunter World was a registered broker-dealer with the Financial Industry Regulatory Authority, Inc. ("FINRA"), and made a market in various United States-based penny stocks.   Hunter World cleared its trades through its clearing broker, RBC.   Through RBC, Hunter World held brokerage accounts for its retail and institutional clients, as well as for the perpetrators of the fraud, in their own names and in the names of nominees.   Hunter World also offered investment banking services, to assist small companies in obtaining capital through private offerings of stock and debt and assisting them to make their stock tradable on public markets.   Hunter World made approximately $32.5 million as a result of the fraudulent scheme, which was allocated equally to Ficeto and Homm as a result of their co-ownership of Hunter World.

        f.   <u>The Hunter Fund, Ltd.</u>:   The Hunter Fund, Ltd. ("Hunter Fund") was a hedge fund incorporated by Ficeto in the British Virgin Islands in 2002, whose only investors were three of the Absolute

Funds.   Ficeto was the President and Chief Executive Officer of the
Hunter Fund and, through Hunter Advisors, LLC, a California limited
liability company that he managed and controlled, its Portfolio
Manager.   As described below, Ficeto and Homm used the Hunter Fund as
a vehicle to extract additional funds from the Absolute Funds to
invest into the penny stocks and manipulate the market for the penny
stocks.   Ficeto directed securities trades by the Hunter Fund through
its brokerage account at Hunter World.

       12.   From in or about September 2003 through September 2007, the
fraud scheme operated generally as follows:

       a.   Homm and co-conspirators at ACMH would induce
investors, including both natural persons and entities, to invest in
the Absolute Funds through investor solicitations.   Such
solicitations would include in-person presentations and meetings,
often including Homm, and would include the use of sales and
marketing literature describing: (1) the investment strategy of each
of the Absolute Funds; (2) the purported research, analysis, and
decision making process used by defendant Homm and ACMH in selecting
investments; (3) historical positive results for the respective
Absolute Funds; and (4) defendant Homm's personal history,
experience, and success as a hedge fund manager.

       b.   Ficeto would identify small companies that had free-
trading penny stock, or that could be reverse merged into public
shell entities with free-trading penny stock.   Through Hunter World,
Ficeto would offer to assist the penny stock companies in finding
equity financing through a private offering, and Hunter World would
enter into agreements with the penny stock companies to facilitate

the private offerings.  At times, before the private offerings, Ficeto would personally obtain, or cause Hunter World to obtain, large blocks of stock or warrants to purchase additional shares at nominal prices.  As set forth below, after inflating the prices of the penny stocks, Homm and Ficeto would sell these shares to the Absolute Funds at inflated prices.

   c. In connection with the private offerings, Ficeto would at times cause Hunter World or the Hunter Fund to provide temporary or "bridge" financing to a penny stock company, secured through a promissory note issued to Hunter World or the Hunter Fund that required the penny stock company receiving the loan to pay a loan fee, and often would permit loan repayment with cash or stock in the company.

   d. Homm and Ficeto then would cause the Absolute Funds to make substantial investments in these penny stock companies by purchasing millions or even billions of shares in private placements. Homm would sign the subscription agreements on behalf of the Absolute Funds, along with Registration Rights Agreements that required the penny stock companies to promptly register the shares so they would be freely tradable.  Ficeto and Homm, through Hunter World, also would obtain agreements from existing shareholders of the penny stock companies to abstain from selling their shares for a certain period of time, often called "lock-up agreements."

   e. As Hunter World's compensation for the transactions, Ficeto and Homm would cause shares and/or warrants to be allocated to Hunter World, Ficeto, Heatherington, Hunter Fund, and their nominees, including CIC Global Capital and Ficeto's minor children.  As set

forth below, after inflating the prices of the penny stocks, Homm,
Ficeto, and Heatherington would sell these shares to the Absolute
Funds at the inflated prices.

      f.   Between in or about December 2004 and in or about July
2007, Homm, together with co-conspirators Ficeto and Heatherington,
caused European Catalyst Fund, Return Europe Fund, and Octane Fund to
invest over $34.6 million in the Hunter Fund.  The Hunter Fund
charged each of the Absolute Funds that held its shares a two percent
monthly management fee and a five percent monthly performance fee.
Homm and Ficeto then caused the Hunter Fund to invest millions of
dollars received from the Absolute Funds into certain of the penny
stock companies.  The investments in and by the Hunter Fund served to
conceal from the public the full extent of ownership of the penny
stock companies by the Absolute Funds.

      g.   After the shares of the penny stock companies became
freely tradeable, Homm, Ficeto and Heatherington would engage in a
variety of trading techniques designed to manipulate the share
prices, principally through brokerage accounts of the Absolute Funds
maintained at Hunter World.  Through Hunter World, Homm, Ficeto and
Heatherington would cause the penny stock shares to be traded between
the Absolute Funds, or between themselves and the Absolute Funds, in
order to drive up the penny stock prices.  The market manipulation
scheme executed through Hunter World used a number of classic
manipulative techniques, including: (1) executing matched orders
("cross-trades") between accounts at Hunter World for the Absolute
Funds, as well as between accounts held or controlled by Ficeto and
Heatherington; and (2) marking the close of the day or the month by

1   executing trades of the penny stocks among the Absolute Funds at or

2   near the close of the trading day in order to set the month or day-

3   end price.

4          h.    Homm caused the manipulative trades to be placed by

5   Heatherington, ACMH's primary trader, who sent hundreds of instant

6   messages ("IMs") between ACMH, in Palma de Mallorca, Spain, to Hunter

7   World's principal trader ("Hunter World Trader"), in Beverly Hills,

8   California, over a secret, alternate messaging system.[3]  The secret

9   IM system enabled the conspirators to communicate without fear that

10  the market manipulation would be discovered by regulators, victim

11  investors, and ACMH employees and executives who were non-

12  participants in the conspiracy.  As reflected in the secret IMs,

13  ACMH's trader, generally Heatherington but at times Heatherington's

14  brother, Craig Heatherington, instructed the Hunter World Trader,

15  acting under the direction and with the knowledge and consent of

16  Ficeto -- or at times Ficeto himself -- to place matched orders,

17  engage in transactions that marked the close, and engage in other

18  manipulative trading techniques for the purpose of artificially

19  raising or propping up the share prices of the penny stock companies.

20         i.    For example, it was the general pattern that, on or

21  near the morning of the last day of the trading month, Heatherington

22  would send a secret IM to the Hunter World Trader with a list of

23  prices to set for various stocks by the end of the day.  The Hunter

24  World Trader then would make trades as necessary to set these prices,

25
26  [3] The use of this secret messaging system was a violation of SEC
    regulatory rules, which required Hunter World to use the Bloomberg
27  instant messaging system, which IMs would be maintained in the
    Bloomberg system and available for review by Hunter World's
28  compliance officer and regulators.

at times with Heatherington making purchases on behalf of ACMH through other brokers.  Heatherington would direct the Hunter World Trader as to which of the Absolute Funds' accounts the trade should be recorded.  Ficeto would often be consulted regarding the trading.

13.  The stock manipulation scheme benefitted Homm, Heatherington and Ficeto by diverting monies from the Absolute Funds to the co-conspirators through (1) sales of the penny stocks from the co-conspirators to the Absolute Funds at inflated prices; and (2) commission, placement and transaction fees charged by Hunter World, in which Ficeto and Homm held a 50 percent interest.

14.  The stock manipulation scheme also benefitted Homm and his co-conspirators at ACMH by materially impacting the Absolute Funds' performance and NAVs, which were calculated at the end of the month, in a practice known as "portfolio pumping."  The manipulation also generated inflated performance and management fees -- forms of compensation that were determined by the reported performance of the Absolute Funds -- for ACMH as investment manager for the Absolute Funds (and derivatively for Homm and his co-conspirators at ACMH). Finally, increasing the prices of the stock of ACMH, in which Homm held a majority interest, permitted him to sell his stock at inflated prices.

15.  Examples of the fraudulent scheme involving two of the penny stock companies (ProElite, Inc. and MicroMed Cardiovascular, Inc.) are described below.[4]

_____

[4] Some of the other penny stock companies included: Cyberkinetics Neurotechnology Systems, Inc.; Berman Center, Inc.; Duravest, Inc.; Intermetro Communications, Inc.; Java Detour, Inc.; Logistical Support, Inc.; and Quest Group International, Inc.

### ProElite, Inc.

16.   ProElite, Inc. ("ProElite") was a company based in Los Angeles, California, that sponsored live and online mixed martial arts events. The fraudulent scheme involving ProElite began in or about September 2006, and eventually included a reverse merger arranged by the conspirators through Hunter World.

17.   Between in or about September 2006 and in or about September 2007, the conspirators caused the Absolute Funds to invest approximately $35 million in private offerings of ProElite shares, and tens of millions in market purchases, to manipulate the price of ProElite shares for their own enrichment.   ProElite reported little revenue from its operations and no profits during the time period.

18.   In or about September 2006, the conspirators caused five of the Absolute Funds to spend approximately $10 million to purchase more than 4 billion shares of ProElite and more than 3 million warrants exercisable at $0.004 per share.   Homm personally signed the Securities Purchase and Registration Rights agreements.

19.   At or about the same time, as part of a repayment of a loan provided to ProElite by the Hunter Fund, Ficeto caused ProElite to issue additional shares to Hunter World, to the minor children of Ficeto, and to Heatherington's entity, CIC Global Capital.   As set forth below, those shares were later sold to some of the Absolute Funds at inflated prices.

20.   After the reverse merger of ProElite in or about October 2006, its stock traded at about $0.10 per share on the Pink Sheets, an over-the-counter quotation service.   Soon thereafter, the

1  conspirators caused the Absolute Funds to begin cross-trading shares
2  of ProElite amongst the Absolute Funds through Hunter World.

3      21.  In or about January 2007, ProElite filed a registration
4  statement with the SEC relating to the shares obtained by the
5  Absolute Funds in or about September 2006, which statement was later
6  amended to register the additional shares received by Hunter World,
7  Heatherington, and Ficeto's minor children.

8      22.  On or about May 15, 2007, the day after the registration
9  statement became effective and the ProElite shares became publicly
10 tradable, Heatherington, using the secret IM system referenced above,
11 instructed a Hunter World Trader to send confirmations of the day's
12 trades only to him.

13     23.  After the close of trading on or about May 15, 2007, at the
14 direction of Heatherington, Hunter World began executing a series of
15 matched orders among the Absolute Funds, causing the stock price to
16 rise from $3.20 to $7.99, and then to $12.99, all within a span of
17 minutes.  Once the stock price reached its peak, Hunter World,
18 Ficeto, and Heatherington all sold portions of their ProElite stock
19 holdings to the Absolute Funds at those artificially inflated prices,
20 as set forth below:

| Trade Date | RBC Account Name | Buy or Sell | Execution Time | Hunter World Reported Volume | Price | Total Proceeds |
|---|---|---|---|---|---|---|
| 5/15/07 | Activist Value Fund | S | 16:36 | (500,000) | $3.20 | $1,600,000 |
| 5/15/07 | Octane Fund | B | 16:36 | 500,000 | $3.30 | $1,650,000 |
| 5/15/07 | Large Cap Fund | S | 16:36 | (600,000) | $3.20 | $1,920,000 |
| 5/15/07 | East West Fund | B | 16:36 | 600,000 | $3.30 | $1,980,000 |

| Trade Date | RBC Account Name | Buy or Sell | Execution Time | Hunter World Reported Volume | Price | Total Proceeds |
|---|---|---|---|---|---|---|
| 5/15/07 | European Catalyst Fund | S | 16:36 | (3,000,000) | $3.20 | $9,600,000 |
| 5/15/07 | Return Europe Fund | B | 16:36 | 3,000,000 | $3.30 | $9,900,000 |
| 5/15/07 | CIC Global | S | 16:38 | (140,000) | $7.99 | $1,118,600 |
| 5/15/07 | Hunter World | S | 16:38 | (800,000) | $7.99 | $6,392,000 |
| 5/15/07 | Return Europe Fund | B | 16:38 | 940,000 | $8.05 | $7,567,000 |
| 5/15/07 | Ficeto as Custodian for his minor daughter | S | 16:40 | (5,000) | $11.99 | $59,950 |
| 5/15/07 | Ficeto as Custodian for his minor son | S | 16:40 | (5,000) | $11.99 | $59,950 |
| 5/15/07 | Return Europe Fund | B | 16:40 | 10,000 | $12.05 | $120,500 |

The manipulative trading caused the Absolute Funds that invested in ProElite to report fraudulent unrealized gains on the investments of over 250% for the month ending May 2007.

24. From on or about May 31, 2007 through on or about August 30, 2007, the conspirators continued to manipulate the price of ProElite stock by causing the Hunter World Trader to execute trades on the last day of the month to set the closing price for the day and month. The conspirators continued to profit from the manipulation by causing the Absolute Funds to purchase additional shares of ProElite from Hunter World, Ficeto, and CIC Capital from in or about June 2007 through in or about September 7, 2007.

25.   During this period, and as further set forth below, the conspirators also laundered proceeds of the fraud by causing proceeds to be transferred from their Hunter World brokerage accounts, maintained by RBC, to their personal accounts at other financial institutions.

26.   After Homm's resignation from ACMH on or about September 18, 2007, the conspirators were no longer able to prop up the share price of ProElite, which began trending downward on thin volume.

27.   From in or about September 2006 through in or about September 2007, Hunter World obtained approximately $14.2 million by selling shares of ProElite to the Absolute Funds, approximately $2.8 million from sales of ProElite shares to the Hunter Fund, and approximately $1.1 million in commissions from executing trades of ProElite.

### MicroMed Cardiovascular, Inc.

28.   MicroMed Cardiovascular, Inc. ("MicroMed"), a company based in Houston, Texas, developed and sought to sell a miniaturized heart pump.  The fraudulent scheme involving MicroMed began in or about August 2005, following a reverse merger arranged by the conspirators through Hunter World.

29.   Between in or about August 2005 and through in or about September 2007, defendant Homm and his co-conspirators caused the Absolute Funds to invest more than $26 million in approximately 24 million shares of MicroMed stock, and manipulated its price for their own enrichment.  During this period and shortly thereafter, MicroMed reported in its SEC filings net losses for 2005 and 2006, and over $6 million in losses for the 9 months ending September 30, 2007.

30.   Starting in or about August 2005, the conspirators caused six Absolute Funds to purchase almost 19 million shares of MicroMed stock in three private placements at prices between $0.72 and $1.55 per share.   Hunter World obtained commissions of more than $2 million on these private placements, as well as 300,000 shares of MicroMed stock and warrants to purchase more than 4 million shares of MicroMed stock.

31.   From December 2005 to March 2007, Ficeto was also a director of MicroMed Cardiovascular, Inc.

32.   As a condition of a June 2006 private offering, Hunter World secured agreements from most of the MicroMed shareholders to lock them out of trading of MicroMed shares until in or about April 1, 2007.   Hunter World and the Absolute Funds were not locked out of such trading.

33.   After locking out most of the MicroMed shareholders from trading (from in or about June 2006 through at least in or about October 2006), the conspirators caused the Absolute Funds to trade MicroMed shares privately between and amongst themselves, either at $0.00 or at below-market prices, while at the same time buying or selling shares through Hunter World in order to set the stock price.

34.   From in or about June 2006 through in or about March 2007, generally through the secret IM system, Heatherington would direct Ficeto and the Hunter World Trader to make market trades using the Absolute Funds' accounts to set the closing price of MicroMed stock for the day or the month.   Thus, the conspirators were able to support the price of MicroMed near $4.00 per share until March 30, 2007.

35.   Starting in or about April 1, 2007, after the lock-up agreements expired, the conspirators were no longer able to prop-up the price of MicroMed, which began an inexorable slide.  By in or about April 23, 2007, the price had dropped as low as $0.32 per share.  The conspirators nevertheless continued to trade MicroMed shares amongst the Funds to set the closing price and reduce losses.

36.   From in or about September 2005 through in or about September 2007, Hunter World obtained approximately $8 million by selling its own shares of MicroMed to the Absolute Funds, and $323,298 in commissions from executing trades of MicroMed stock.

### The Scheme Collapses

37.   In or about June 2007, Homm, through his entity CSI, sold over 2 million of his shares in ACMH for over €15 million.

38.   In the summer of 2007, the Absolute Funds' prime brokers, Morgan Stanley & Co. and Deutsche Bank, executed calls to reduce the Absolute Funds' margins -- that is, the amount of monies that could be borrowed by the Absolute Funds from the prime brokers relative to the value of the cash and stock held in the Absolute Funds' accounts. The Absolute Funds were forced to liquidate certain assets, which raised awareness within ACMH as to the illiquid nature of the penny stock assets.

39.   In or about August 2007, Homm approached the Board of Directors of ACMH and offered to prop-up the Absolute Funds' performance by giving 5 million of his ACMH shares, held through CSI, to Activist Fund, European Catalyst Fund, and Octane Fund in order to increase these Absolute Funds' liquidity and offset losses.  The Directors agreed to accept the shares, but only if the gift was

18

1   disclosed pursuant to London Stock Exchange rules and included in the

2   Absolute Funds' investor newsletters, which generally were

3   disseminated in or about the middle of the following month.

4       40.   On or about September 18, 2007, before the disclosure of

5   the Homm gift, Homm was scheduled to meet with ACMH's new chief

6   executive in Palma de Mallorca, Spain, to discuss the increased

7   oversight of Homm's investment decisions and bonus payments.

8   Instead, Homm abruptly resigned and fled, purportedly with $1.2

9   million in cash hidden in the clothing and belongings of Homm and his

10  traveling companion.

11      41.   Thereafter, a number of legal actions were initiated

12  against Homm, Ficeto, Hunter World and others, including a complaint

13  filed by the SEC in the Central District of California on or about

14  February 24, 2011, entitled SEC v. Ficeto et al., CV 11-1637-GHK,

15  alleging civil securities fraud and related charges against Ficeto,

16  Homm, Heatherington, Hunter World and Hunter Advisors, LLC.   The SEC

17  case is currently stayed.

18  Tracing of Fraud Proceeds to the Subject ANZ 368 and ANZ 662
19  Accounts

20      42.   Based on statements made by Ficeto in the course of sworn

21  testimony related to the Absolute Funds, U.S. securities industry

22  regulatory records, and bank records, Plaintiff alleges that Ficeto's

23  principal source of income from approximately September 2004 through

24  approximately February 2008 was fraud proceeds from Hunter World and

25  Hunter Advisors.

26      43.   In or about January 2008, in response to a regulatory

27  inquiry from FINRA, counsel for Hunter World and Ficeto represented

28

the following regarding Ficeto's interest in and compensation from Hunter World:

      a.   Ficeto was co-owner, President, and Chief Executive Officer of Hunter World;

      b.   Ficeto's compensation was derived from the profits of Hunter World;

      c.   Ficeto made no capital contributions to Hunter World during the "Relevant Time Period" (this time period was not defined in the letter from Ficeto's counsel, but the question from FINRA asked about any and all capital contributions); and

      d.   Ficeto possessed a 50 percent ownership interest in Hunter World. Ficeto said the then-current value of his interest in Hunter World was approximately $4.9 million.

    44.   The following admissions were contained in Department of the Treasury Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts ("FBAR"), filings made by or on behalf of Ficeto for the years 2008, 2009, and 2011:

      a.   On or about June 26, 2009, Ficeto filed an FBAR for 2008 in which he reported ownership of the ANZ 368 account with a maximum value in 2008 of $10,016,705.

      b.   On or about June 26, 2010, Ficeto filed an FBAR for 2009 in which he reported ownership of the ANZ 368 account with a maximum value in 2009 of $10,039,700.

      c.   On or about June 1, 2012, Ficeto filed an FBAR for 2011 in which he reported ownership of the ANZ 368 account with a maximum value in 2011 of $7,998,283. In addition, Ficeto reported ownership of the ANZ 662 account with a maximum value in 2011 of

1  $42,545.

2      45.  ANZ records reflect the ANZ 662 and 368 accounts were

3  opened in or about August 2008.  Both accounts were held in the name

4  of Morgan Pacific Inter Vivos Settlement Trust and listed the

5  signatory trustee as Charles Ficeto, President/Treasurer of Pacific

6  Blue Consulting, Ltd., and the corporate trustee as Southpac Trust

7  International, Inc.  Ficeto was listed as the beneficial owner and

8  also signed a "Source of Funds Declaration[s]" indicating that he was

9  the remitter of the funds, and that the funds were acquired through

10  "business activity, salary, profits from business, sale of stocks."

11  Charles Ficeto is the father of Todd Ficeto.  According to Southpac

12  Group's website, it "helped to create the modern offshore asset

13  protection trust. . .  In 1989, Southpac helped create the world's

14  first asset protection trust legislation, the Cook Islands

15  International Trusts Act."

16      46.  On or about September 4 and 5, 2008, Ficeto testified under

17  oath in the investigation by the SEC.  In his testimony on September

18  4, 2008, Ficeto testified that he had no foreign accounts.  About

19  three weeks later, Ficeto's counsel sent a letter to the SEC

20  attempting to correct Ficeto's testimony and disclosed that Ficeto

21  had an account at ANZ.

22      47.  Plaintiff alleges that Ficeto opened the subject ANZ

23  accounts in an attempt to conceal the funds from law enforcement in

24  the United States.  Ficeto had been interviewed by FINRA in January

25  2008 about his business and finances.  Later that year (in

26  approximately August 2008), he opened the subject ANZ accounts in the

27  Cook Islands in the name of a trust with his father Charles Ficeto as

28

1 the signatory trustee and transferred approximately $10 million of
2 fraud proceeds to ANZ 662.

3     48.   In approximately June 2008, Ficeto also transferred his
4 multi-million dollar Malibu real property into the name of Western
5 Promethean Grantor Retained Income with his father listed as Trustee.
6 Charles Ficeto is a senior citizen who has resided in the same
7 residence in New York for over 40 years, and does not appear to have
8 the financial means to be able to afford to pay the large monthly
9 mortgage payments from his own income.

10     49.   As described above and reflected in Exhibits A and B,
11 Ficeto and Hunter World received millions of dollars in proceeds from
12 fraudulent transactions related to the penny stock companies.   The
13 wire transfers of fraud proceeds illustrated on Exhibits A and B
14 occurred between the years 2006 and 2008 and are outlined to show the
15 tracing of the funds in the subject ANZ accounts.   These Exhibits do
16 not reflect all of the wire transfers of fraud proceeds that Ficeto
17 received as a result of the scheme.

18     50.   As described in pars. 9-10 above, Ficeto's profits from
19 self-dealing transactions in shares of the penny stocks were
20 primarily cleared through RBC accounts that he controlled.   And once
21 the fraud proceeds were received in the various accounts that he
22 controlled, Ficeto would make multiple transfers of the funds to
23 accounts held in his name and Hunter World at Union Bank of
24 California and Wells Fargo Bank.

25     51.   Ficeto eventually transferred approximately $15 million of
26 the fraud proceeds to Treasury Direct, a retail system run by the
27 United States Treasury Department to facilitate investments in

28

1    government fixed income products.  These monies were then transferred
2    back out of Treasury Direct's account to Ficeto's Wells Fargo account
3    ending in 0503 ("Ficeto WF 0503").

4        52.  On or about July 31, 2008, five wire transfers totaling
5    $5,000,000 were sent from the Ficeto WF 0503 account to Ficeto's
6    Wells Fargo account ending in 1215 ("Ficeto WF 1215").  On or about
7    August 29, 2008, Ficeto caused $5,000,000 to be wire transferred from
8    Ficeto WF 1215 to ANZ 662. On the same day, he caused $4,925,000 to
9    be wire transferred from Ficeto WF 0503 to ANZ 662.  Then, on or
10   about October 13, 2008, $9,998,010 was transferred from ANZ 662 to
11   ANZ 368.

12       53.  During the period of approximately October 13, 2008 to
13   January 30, 2013, the ANZ 368 account earned interest that was
14   subsequently transferred to the ANZ 662 account.  In addition, during
15   this same time period, several wires totaling approximately $4
16   million were sent from ANZ 368 to Ficeto's Wells Fargo account ending
17   in 0495 ("Ficeto WF 0495") and to JPMorgan Chase account ending in
18   1441 held in the name of Western Promethean Grantor Retained Income
19   Trust ("Western Promethean Chase 1441").  His father Charles Ficeto
20   is the only signatory on Western Promethean Chase 1441, which is an
21   account from which mortgage payments for Ficeto's Malibu real
22   property were drawn.

23                          FIRST CLAIM FOR RELIEF

24       54.  Plaintiff alleges that the defendant bank funds are subject
25   to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)
26   (C) because they represent or are traceable to proceeds of one or
27   more violations of 18 U.S.C. § 1349 (conspiracy to commit securities

28

fraud); 18 U.S.C. § 1348 (securities fraud); and 18 U.S.C. § 1343 (wire fraud).   These violations constitute "specified unlawful activity" pursuant to 18 U.S.C. §§ 1956(c)(7)(A), 1961(1)(B)(wire fraud) and 1961(1)(D)(offenses involving fraud in the sale of securities, punishable under any United States law).

SECOND CLAIM FOR RELIEF

55.   Plaintiff further alleges that the defendant bank funds are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because they were involved in one or more violations of 18 U.S.C. §§ 1956 (money laundering) and 1957 (transactions in criminally-derived proceeds).

WHEREFORE, plaintiff United States of America prays that:

(a)   due process issue to enforce the forfeiture of the defendant bank funds;

(b)   due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)   that this Court decree forfeiture of the defendant bank funds to the United States of America for disposition according to law; and

///
///
///
///
///
///
///
///

1          (d)   for such other and further relief as this Court may deem

2   just and proper, together with the costs and disbursements of this

3   action.

4   DATED: November 25, 2013        ANDRÉ BIROTTE JR.
                                    United States Attorney
5                                   ROBERT E. DUGDALE
                                    Assistant United States Attorney
6                                   Chief, Criminal Division
                                    STEVEN R. WELK
7                                   Assistant United States Attorney
                                    Chief, Asset Forfeiture Section
8

9                                   _Katherine Schonbachl_
                                    KATHARINE SCHONBACHLER
10                                  Assistant United States Attorney

11                                  Attorneys for Plaintiff
                                    United States of America
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>VERIFICATION</u>

I, Elliot M. Manegold, hereby declare that:

1.    I am a Special Agent with the Federal Bureau of Investigation and am the case agent for the forfeiture matter entitled <u>United States of America v. $5,437,986.06 and $32,886.36 in Bank Funds</u>.

2.    I have read the above Verified Complaint for Forfeiture and know its contents.  It is based upon my own personal knowledge and reports provided to me by other law enforcement personnel.

3.    Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed November 22, 2013 in Los Angeles, California.

ELLIOT M. MANEGOLD

**Exhibit A**

### Overview of Tracing of $14,908,699 in Funds Transferred In and Out of Treasury Direct

| | | | |
|---|---|---:|---:|
| RBC Dain Rauscher (see below) | $ | 12,291,865 | 82.4% |
| WF Corp Trust (see below) | $ | 1,637,793 | 11.0% |
| Troy & Gould | $ | 636,250 | 4.3% |
| Unknown | $ | 255,000 | 1.7% |
| Interest | $ | 87,791 | 0.6% |
| | $ | 14,908,699 | 100.0% |

| WF Corp Trust Breakdown | | |
|---|---|---:|
| Quest Group | $ | 1,032,500 |
| ProElite | $ | 555,293 |
| MicroMed | $ | 50,000 |
| | $ | 1,637,793 |

| RBC Dain Rauscher Breakdown | | |
|---|---|---:|
| ProElite | $ | 7,983,905 |
| Unknown RBC Acct | $ | 2,817,036 |
| MicroMed | $ | 987,271 |
| Quest Group | $ | 482,535 |
| Novint Technologies | $ | 21,118 |
| | $ | 12,291,865 |

27

Exhibit "A"



Exhibit B

Tracing of Funds Transferred In and Out of Treasury Direct and Then to ANZ 662 Account

Exhibit "B"

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Dean D. Pregerson_____ and the assigned Magistrate Judge is _____John E. McDermott_____ .

The case number on all documents filed with the Court should read as follows:

## 2:13CV8685 DDP JEMx

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____November 25, 2013_____
Date

By _J.Prado_____
Deputy Clerk

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| | | |
|---|---|---|
| [x] **Western Division**<br>312 N. Spring Street, G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Ste 1053<br>Santa Ana, CA 92701 | [ ] **Eastern Division**<br>3470 Twelfth Street, Room 134<br>Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

COPY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| United States of America | $5,437,986.06 and $32,886.36 in Bank Funds |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) |
|---|---|
| Katharine Schonbachler, Assistant United States Attorney 1400 United States Courthouse, 312 North Spring Street Los Angeles, California 90012 Telephone: (213)894-6166 Fax: (213) 894-7177 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

18 U.S.C. §§ 981(a)(1)(A) and (C)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee ☐ 510 Motions to Vacate Sentence | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 535 Death Penalty | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | **Other:** | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 540 Mandamus/Other | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | **FORFEITURE/PENALTY** | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☒ 690 Other | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **LABOR** | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 790 Other Labor Litigation | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 791 Employee Ret. Inc. Security Act | |
| | | | ☐ 448 Education | | |

**FOR OFFICE USE ONLY:** Case Number: **CV13-8685**

CV-71 (09/13)  **CIVIL COVER SHEET**  Page 1 of 3

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [X] No | [ ] Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?<br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| [X] Yes  [ ] No | [X] Los Angeles | [ ] Los Angeles | Western |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of defendants reside: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of claims arose: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |

**C.1.** Is either of the following true? If so, check the one that applies:

[ ] 2 or more answers in Column C

[ ] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2.** Is either of the following true? If so, check the one that applies:

[ ] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  [X] NO   [ ] YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   [ ] NO   [X] YES

If yes, list case number(s):  CV 11-1637-GHK; CR Misc. No. 13-0183; and CR Misc. No. 13-2726

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  [X] A. Arise from the same or closely related transactions, happenings, or events; or

[X] B. Call for determination of the same or substantially related or similar questions of law and fact; or

[X] C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ] D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** *Katharine Achenbach*    DATE: November 25, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |